No. 2--06--1146

_____

IN THE

APPELLATE COURT OF ILLINOIS

SECOND DISTRICT

_____

| | | |
|---|---|---|
| THE PEOPLE OF THE STATE OF ILLINOIS, | ) ) ) | Appeal from the Circuit Court of Kendall County. |
| Plaintiff-Appellee, | ) ) | |
| v. | ) ) | No. 04--CF--489 |
| MARCELINO ALFARO, JR., | ) ) ) | Honorable James M. Wilson and William H. Weir, |
| Defendant-Appellant. | ) | Judges, Presiding. |

_____

JUSTICE O'MALLEY delivered the opinion of the court:

Following a jury trial before the circuit court of Kendall County, defendant, Marcelino Alfaro, Jr., was convicted of first degree murder (720 ILCS 5/9--1(a) (West 2004)) and obstructing justice (720 ILCS 5/31--4(a) (West 2004)) in the shooting death of Jorge Badillo. Defendant received concurrent prison sentences of 25 years for the murder conviction and 2 years for the obstructing-justice conviction. Defendant appeals, contending that the December 15, 2004, statements he made should be suppressed because they were elicited in violation of Miranda v. Arizona, 384 U.S. 436, 16 L. Ed. 2d 694, 86 S. Ct. 1602 (1966); that his plea agreement should be reinstated because the State improperly repudiated the agreement; and that he received ineffective assistance of counsel because his trial attorneys, Brian Hiatt and Francis Weinert, failed to facilitate the plea agreement and failed to advise defendant to withdraw his plea of guilty to the obstructing-

justice charge after the plea agreement was terminated. We agree with the suppression issue and vacate defendant's convictions and remand for further proceedings.

## I. BACKGROUND

We summarize the facts relevant to our consideration of defendant's appeal. On December 4, 2004, at about 9 p.m., the body of the 16-year-old victim was discovered on a gravel road in rural Kendall County. The victim had been shot four times--three times in the head and once in the right shoulder. Two .22-caliber and two .45-caliber bullet casings were found at the scene.

The Kendall County sheriff's police investigated the offense. Through their investigation, they learned that, on December 4, defendant, then 19 years of age, had been seen with the victim. On December 14, 2004, two detectives went to defendant's place of employment, Eby-Brown in Montgomery. They met defendant as he was leaving his third-shift job and interviewed him in a conference room at Eby-Brown. The interview lasted for several hours. Defendant denied that he knew anything about the victim's death.

Later in the day of December 14, 2004, detectives interviewed Isabel Ocon, a former girlfriend of defendant. Ocon provided a written statement to police. Ocon wrote that, on December 5, 2004, defendant had stopped by the store where she worked. Defendant told her that the victim was dead, but that the victim was supposed to have been only beaten up. Defendant also told Ocon that his job was to gain the victim's trust so that others could beat him. The others, however, shot and killed the victim.

### A. Defendant's December 15, 2004, Videotaped Statement

Early in the morning of December 15, 2004, after having obtained Ocon's statement, detectives again returned to Eby-Brown at the end of defendant's shift. They asked defendant if he

would come to the sheriff's office for a videotaped informational interview. They represented that, after the interview, they would provide defendant with a ride to wherever defendant wished to be taken. Defendant agreed. Defendant was not handcuffed and was not told that he was under arrest. Defendant was not wearing a coat or jacket when he was taken to the sheriff's office. (Defendant explained that he generally did not wear a jacket, even during the winter.) Defendant was questioned for more than three hours in an interview room at the sheriff's office. At the end of this time, Detective Joseph Jasnosz read defendant his Miranda rights, and a further interview with Assistant State's Attorney Jean Fletcher occurred. During the course of these interviews, defendant gave several different versions of the events on December 4, eventually admitting that he was present when the victim was killed.

Beginning at about 7 a.m., Detective David Ratkovich interviewed defendant in the interview room. For the first 20 minutes, Ratkovich asked general background questions. Ratkovich then questioned defendant about his activities on December 4. Defendant told Ratkovich that he had been driving around with the victim during the afternoon and early evening of December 4. During this time, the victim purchased and used some cocaine from "Musto." Later, defendant and the victim had an encounter with some Vice Lords. When the Vice Lords began to pursue them, the victim jumped out of the car and ran off between some houses and through the yards. Defendant did not know what happened after that, and defendant learned about the victim's death a few days ago. A break was taken. Defendant left the interview room by himself to go to the restroom. Shortly after this, defendant returned by himself to the interview room and sat down. An officer, who was out of the camera's range, talked to defendant about matters unrelated to the case.

Ratkovich returned to the interview room. He began this round of questioning with the phrase, "not to be accusatory," and asked defendant a number of questions, like, "did you do this" and why would defendant be named as a suspect. At around the hour-and-a-half mark, Ratkovich confronted defendant and told him that the investigation showed that defendant had been present when the victim was killed. Ratkovich stated that defendant was not being truthful in his statement. Defendant then changed his story, telling Ratkovich that several guys in a Suburban pulled up and took the victim away to beat him. Ratkovich also admonished defendant that "it will [all] come down on you" if defendant persisted in refusing to tell police what happened. Defendant maintained that he did not know that the beating had turned into a shooting. Ratkovich told defendant that his story did not agree with the evidence the police had collected so far.

At around 1 hour and 50 minutes into the interview, Ratkovich left and was replaced by Jasnosz. Ratkovich explained to defendant that he had to attend to something else and that Jasnosz would question him for a while. Jasnosz indicated that the police believed that defendant had been with the victim at the scene of the killing. Jasnosz told defendant that he "was accountable for what has taken place" and that, even if he did not answer the questions, his problems and the investigation were "not going away." Jasnosz then showed defendant a picture of an electric chair, telling defendant that he was in the same position as Scott Peterson, who had lied to the police. After Jasnosz spoke in this vein for about half an hour, defendant became more forthcoming. At about the 2-hour-and-17-minute mark of the interview, Jasnosz said, "I don't think you thought Jorge was going to die. You just thought Jorge would get a beating?" Defendant agreed. After this, defendant asked Jasnosz, "If I tell you who pulled the trigger, will you let me leave?" Defendant also asked, "My name never comes up?" Jasnosz replied, "If you are 100% truthful, I will be on the phone. You

don't have to leave. I'll be on the phone with Aurora and the State's Attorney's Office and protect you."

With this assurance, defendant described how "Musto," a gang leader, ordered the victim's beating. Defendant said that "Danny" and a "big guy," who was unknown to defendant, got into defendant's car with the victim. They told defendant to drive out to rural Kendall County. As defendant drove up to the scene of the offense, the "big guy" in the backseat began to punch or to pistol-whip the victim. Defendant skidded to a sudden stop, ending up partially in the ditch alongside the roadway. The victim jumped out of the car, and the scuffle continued. The victim tried to pull out a gun, and Danny shot him.

Defendant explained that the victim, who belonged to the Latin Kings, was supposed to get his "outs" from the gang, meaning a severe beating, as punishment for "flip-flopping," or going back and forth between gangs. Defendant stated that he was a friend of one of the leaders of the Maniacs, so the Latin Kings thought defendant was a Maniac. When the victim was seen with defendant, the Latin Kings believed that the victim was flirting with the Maniacs.

At about 2½ hours into the interview, Jasnosz asked defendant to "take five minutes and go over [the events] again." Defendant substantially repeated his most recent narrative of the events leading to the victim's shooting.

Defendant maintained that he did not know that the victim would be shot. Defendant identified a picture of Daniel Casas (Casas or Danny Casas) as the shooter, "Danny Culver." At about 2 hours and 50 minutes into the interview, Jasnosz informed defendant that he had "criminal liability for being at the scene." Jasnosz took away defendant's shoes and socks, explaining that they needed to be examined for evidence, and left the room for about five minutes. Jasnosz returned and

questioned defendant about the guns that were used and about his December 5, 2004, conversation with Ocon. At just past three hours into the interview and after answering these questions, defendant asked, "When can I leave? You've told me 'a little bit,' but I've been here since 7 a.m." Jasnosz replied that "other things" were taking place that were outside of his control. At this point, Sergeant Koestner entered the room and told defendant that he was not under arrest and not in custody. Koestner asked defendant to stay a few more minutes. Defendant agreed but stated that he would not stay past 10:30 a.m. Defendant also complained that his feet were cold; eventually, an officer brought him a pair of slippers.

At 10:10 a.m., about 3 hours and 10 minutes into the interview, Jasnosz returned with Fletcher. Jasnosz told defendant that, "just for formality," he had brought along "just a Miranda waiver." Jasnosz read defendant his Miranda rights from the preprinted form and asked defendant to read and sign the form at the bottom. Defendant complied.

Defendant repeated to Fletcher the version he had just given Jasnosz. Defendant told Fletcher that he was scared when the victim and the other two were in his car, because he thought they were after him. Defendant maintained that he was not in a gang, but admitted that he used to hang out with some Latin Kings and that members of his family were in the Latin Kings. Defendant told Fletcher that he was afraid that the other two men at the shooting would find him and kill him. Defendant also told Fletcher that, several days after the victim's death, someone stole his car. Defendant noted that the car actually belonged to Stephanie Beals, a former girlfriend and the mother of defendant's child. When asked why he had agreed to speak to the police, defendant said it was because "you said you could protect me." A short time later, defendant was informed that he was under arrest.

B. Defendant's December 20, 2004, Videotaped Statement

On December 20, 2004, while in the custody of the sheriff's department, defendant agreed to give another videotaped interview with Jasnosz. During this interview, defendant was accompanied by counsel, Weinert. Additionally, defendant received Miranda warnings before giving his statement.

In the December 20, 2004, interview, defendant delivered another version of the events. Defendant stated that he and the other three were drunk and went out into rural Kendall County in order to shoot the victim's Tech 22 gun. The others told defendant where to drive. Soon after the victim got out of the car, defendant heard a shot. Defendant saw the victim grab his head and then his left arm. Defendant believed that the victim somehow had shot himself. Then defendant saw Danny chasing the victim around the car. The victim ran across the road and then back toward the driver's side of the car. Danny began to hit the victim with a gun, and defendant said, "What the hell are you doing?" By this time, the victim was on the ground. Danny went around the back of the car and picked up the victim's Tech 22 gun. Danny stood over the victim and fired the weapon down at the victim. Danny got into the front passenger seat and told defendant, "drive."

At this point in the December 20, 2004, interview, Jasnosz told defendant that the police knew that the fourth person in the car was Walter Pineda. Defendant said, softly, "I can't say anything about that." Jasnosz asked defendant if there could be some "real bad repercussions" if he talked about Pineda, and defendant agreed that that was the case. Defendant said that, after the shooting, Danny kept the guns. Defendant explained that Danny shot the victim to retaliate for the time when the victim and other Latin King gang members beat up Danny's mother. In shooting the victim, Danny had gained revenge on the Latin Kings and earned "credibility" to join a different

gang.  Defendant denied that Musto, the gang leader who sold the victim cocaine, ordered the beating.  Defendant said that, although the victim owed Musto money for the cocaine, Musto thought of the victim as a son.

Jasnosz showed defendant a picture of Pineda and said that there was evidence that Pineda was at the shooting.  Defendant again stated that he could say nothing about Pineda because otherwise he would be in "way over [his] head."  Later during the interview, Jasnosz asked whether Pineda stayed in the car during the shooting.  Defendant deflected the question, saying, "I can't say anything about that."  At the end of the interview, Jasnosz told defendant and Weinert to "talk to your witnesses."

### C. Pretrial

Eventually, defendant was indicted with three counts of first degree murder and one count of obstructing justice.  The obstructing-justice count alleged that defendant destroyed physical evidence by cleaning the victim's blood out of his car.  Count I (first degree murder) was dismissed.

Defendant filed a motion to suppress the statements given to the police and the assistant State's Attorney.  At the suppression hearing, Jasnosz testified that, during the December 15, 2004, interview at the sheriff's office, it would have been easy for defendant to leave the interview.  Jasnosz explained that, while the police had information that defendant was at the scene of the killing, they had no specifics that made defendant a suspect rather than a witness.  The trial court, Judge Wilson, reviewed the recordings of the December 15 interview before he ruled on the motion.  The trial court noted:

"The initial interview by [D]etective Jasnosz, while in the beginning was clearly voluntary, progressed to a point where Miranda certainly should have been considered.  However, the

defendant, after having been given <u>Miranda</u> warnings, voluntarily waived his rights under <u>Miranda</u>, and voluntarily made statements which are admissible. The purposes of <u>Miranda</u>, and the cases consolidated and decided therewith addressing coercion, trickery, force, etc. to elicit involuntary statements by in-custody questioning of persons by law enforcement officials, was not present in this case."

The trial court denied defendant's motion to suppress.

### D. Guilty Plea

On August 5, 2005, the parties reported to the trial court that they had reached a plea agreement. The State agreed to dismiss all of the first degree murder charges in exchange for defendant's plea of guilty to the obstructing-justice count and his plea of guilty to a newly filed charge of second degree murder in case No. 05--CF--253. Additionally, defendant agreed that he would "cooperate with law enforcement" and would "testify as necessary as directed by the Kendall County State's Attorney's Office in any trial regarding" the victim's death. The trial court determined that defendant had knowingly and voluntarily decided to plead guilty and assured itself that a factual basis existed for the plea. The trial court immediately entered the convictions and set the matter for a sentencing hearing to occur in October.

On the day before the scheduled sentencing hearing, defendant agreed to make another videotaped statement to the State's Attorney's office. Fletcher conducted the interview; Ratkovich and Weinert were also present during the interview.

In this interview, Fletcher told defendant that she wanted him to tell her everything, starting from the beginning. This statement (the plea agreement statement) was similar to defendant's December 20, 2004, statement. Defendant described that he and the victim had driven around for

several hours, drinking and doing drugs while stopping at a number of locations. They picked up Danny during the course of their wanderings. Danny sat in the backseat, and the victim sat in the front. Defendant drove them to get the victim's new gun, a Tech 22. The victim proposed that they go somewhere and shoot the gun.

Defendant drove to a rural spot. Danny and the victim got out of the car. When the victim bent down to cock his gun, defendant heard a gunshot and observed that the victim jumped up and grabbed his left elbow. Defendant then observed that the victim tried to run but Danny fired a handgun at him. Danny pistol-whipped the victim near the front driver's-side door, and the victim collapsed to the ground. While the victim was on the ground, Danny grabbed the Tech 22 and used it to fire two more shots into the victim. Danny stripped off the victim's bloody hoodie sweatshirt.

Defendant stated that Danny got back into the car and told him to drive to Sandra's house. There, Danny dropped off the guns. Next, defendant and Danny picked up Pineda, and all three went to Lindsay's house. The following day, defendant cleaned up the blood that was in his car, using Windex. Two days later, the car was reported stolen, having been taken from in front of defendant's house.

Fletcher and Ratkovich left the interview briefly. When defendant and Weinert were alone in the interview room, Weinert reminded defendant that, in his previous statements, there had been three other people in his car when he reached the rural road. Defendant told Weinert that he could not say anything about that because "they'll kill me." Weinert suggested that defendant tell Fletcher that he was afraid, because Weinert was sure that the prosecutor would have questions about this version of the events.

Fletcher returned to the interview, immediately challenging defendant about the differences between his statement and the December 15, 2004, statement. Fletcher told defendant that she thought he was trying to protect Pineda, noting that Pineda had disappeared from the plea agreement statement. Fletcher reminded defendant that, in December, he had stated that the victim was supposed to receive a beating and that defendant had quickly pulled over to the side of the road. Defendant agreed that he pulled over to the side of the road, but explained that, in December, he made up the story that the victim was to be beaten. With regard to Pineda, defendant told Fletcher, "I can't say anything about that." Fletcher reminded defendant that he was scheduled to be sentenced the next day and that he had made a deal with the State's Attorney's office to tell the truth. Fletcher also noted that a hat with Pineda's DNA had been recovered from the scene.

Defendant began to weep. He told Fletcher that Pineda had not touched the victim and that defendant needed to remain alive for his son's sake. Fletcher asked, "What makes you think covering up for [Pineda] is going to protect you at all?" Fletcher and Ratkovich again left the room, parting with the admonition that this was defendant's chance to tell them what happened.

After Fletcher and Ratkovich left, Weinert told defendant to be honest. When they returned, Fletcher asked defendant when Pineda first got into the car. Defendant explained that he picked up Pineda on the way to get the victim's gun, because he mistrusted Danny. Defendant maintained that the victim sat in the front seat with him, while Danny and Pineda sat in the backseat. According to defendant, Pineda was in the Maniacs and had been incarcerated as a juvenile with defendant's older brother. Danny was also a friend of defendant's brother. Danny was carrying a gun when he got into defendant's car. Defendant stated that he did not know that, at the time of the shooting, Danny had been given his "outs" from the Latin Kings and was no longer a member.

Defendant described how he swerved to a stop in the ditch alongside the rural road. Everybody smoked cigarettes, and the victim, Danny, and Pineda got out of the car. The victim got out of the car and into the grass in the ditch. Defendant just heard the first shot. He saw the victim run around the car and head across the street, then run back toward the car with his hands over his face. Danny knocked the victim down. Defendant thought that Pineda might have pushed Danny, and there was a fight with Pineda. Defendant explained that Danny shot the victim for revenge. Defendant stated that the victim was one of the Latin King "shorties" who had beaten up Danny's mother.

Defendant stated that, after the shooting, Danny got into the front seat with the victim's hoodie. There was a lot of blood in the car from the hoodie. Danny left the hoodie and the guns at Sandra's house. Defendant went into Sandra's house with Danny and Pineda. Defendant threw up in the bathroom, and Pineda told him to calm down. After that, the three went to Lindsay's house. Defendant noted that he had planned to go to Lindsay's house with the victim that evening.

Responding to further questioning, defendant stated that he did not know how the victim's blood got into the backseat of his car. Defendant explained that there was blood on the front passenger floor mat, and Danny had blood on his face. Defendant noted that he got blood on his hands from the hoodie, and blood had seeped into his CD case.

Defendant demonstrated how Danny fired his gun at the victim and how Danny used the victim's gun to fire some of the shots. Defendant explained that Musto was in charge of the "shorties" for the Latin Kings, and he gave the Tech 22 to the victim because the victim was Musto's "right hand shorty." When the interview concluded, defendant acknowledged that he would have to testify at the others' trials.

On the day following the plea agreement interview, which day had been scheduled for defendant's sentencing, the prosecutor requested a continuance because the plea agreement had not been completed yet. The prosecutor also informed the trial court that he needed some more time to further investigate. The trial court granted the continuance.

### E. Motion to Reinstate Original Charges

On November 29, 2005, the State moved to reinstate the original first degree murder charges. The prosecutor also stated that defendant could move to withdraw his guilty plea. The motion to reinstate alleged that: (1) defendant's attorneys canceled a September 29 interview by calling the State's Attorney's office a half-hour after the scheduled start; (2) defendant's attorneys canceled an October 6 interview by calling the State's Attorney's office 20 minutes after the scheduled start; (3) defendant's plea agreement statement was inconsistent with previous statements; (4) defendant refused to participate in an October 20 polygraph examination because his attorney was not present; and (5) defendant refused to participate in a November 8 polygraph examination because his attorney was not present, notwithstanding that the examination had been scheduled with the attorney.

The State attached Fletcher's affidavit to its motion to reinstate. Fletcher averred that, on October 6, before the second attempt at interviewing defendant, she learned that defendant's attorneys had not visited with him since at least mid-September. Before the October 12 plea agreement interview, Fletcher learned that defendant's attorneys still had not visited defendant at the jail. Fletcher also averred that, for the second scheduled polygraph examination, despite previously arranging with defendant's attorneys the date, time, and location, neither of defendant's attorneys showed or left a message to explain their absence. Defendant refused to participate in the polygraph examination without the presence of his attorneys.

Defense counsel Hiatt requested leave to file a written response. The trial court allowed the request and ordered defense counsel to file a response on or before December 6, 2005. On December 9, 2005, defense counsel filed a response. Defense counsel attached what purported to be Weinert's affidavit; the affidavit, however, was neither signed nor notarized. The response attempted to explain defense counsel's absences, arguing that counsel's scheduling conflicts should not be attributed to defendant and that the State's charge that the plea agreement statement was not truthful was speculative. Defense counsel argued that the State was retaliating in moving to reinstate the charges. Counsel also argued that, because the State had nol-prossed the original charges, it needed to file a new information or indictment.

At the hearing on the State's motion to reinstate and defendant's response, the State orally moved to strike defendant's response because it was untimely and because the attached affidavit had not been signed or notarized. The State suggested that, if the trial court allowed defendant's response to stand, an evidentiary hearing might be required. The State also pointed out the number of times defense counsel had canceled the scheduled interviews and not appeared for the polygraph examinations. The State characterized defendant as "unavailable" for the polygraph examinations, due to his refusal to participate in the absence of counsel.

Defense counsel responded that he had managed to obtain a sworn affidavit to attach to the response. The trial court granted the State's oral motion to strike and refused to consider the untimely written response. The trial court did, however, grant leave to defense counsel to orally argue defendant's position. Following argument, the trial court, Judge Wilson, ruled:

"Okay. Well, it's pretty obvious what's going on. As far as I'm concerned, I mean, it's a two-way street. The State makes agreements and they are bound to them and there are

many times when they've tried to be vacated and I've denied them. The State has stuck with the agreement and the defendant complies. I do remember part of the agreement was the defendant was going to assist the State in their investigation and cooperate. He pled guilty on August 5th of 2005 and I set the date for sentencing hearing for October 13th thinking all that could have been done by October 13th. It wasn't. So it was continued again to November 29th. It's more than 4 months ago since this agreement was entered and we're still no further now than we were on August 5th and that's not right, especially anybody that knows me and knows how I try to keep cases moving. It's kind of like justice delayed is justice denied and that I've always tried to keep cases moving but just today is very indicative of what's been going on.

There was an order entered on November 29th that the defendants [sic] are granted leave to file a response by December 6th, 2005. Defense doesn't file it by December 6th. They file it on December 9th. In response to the affidavit filed by the State in support of their motion, the affidavit that's filed with the [defendant's] pleading is not signed, not notarized. This is December 13th. I don't understand why a pleading would be filed, not signed, but even more indicative of that is that the case was scheduled for 1:00. The case was called. [Defendant] was brought out. He was standing here without his attorneys. I mean, it's like I don't understand why people can't be in certain places and do things by certain times. This isn't court when people feel like doing things or when they feel like showing up or when they feel like they're going to cooperate or if they feel like doing what they want to do when they want to do it. That isn't it. If that's the way court's going to be done, then my opinion is we destroy all court orders and just put somebody in a room in a

robe and whenever lawyers show up or whenever pleadings get filed or whenever somebody wants to do something, just show up and we'll put a judge there 24 hours a day just so we can be convenient to everybody else to show up if, as, and when they want to.

It seems very funny to me that the allegations that the State makes is because the defendant's lawyers don't show up. Well, they don't show up for court, they don't file their pleadings on time, and I'm sitting here now more than four months since all this stuff was supposed to be done. And if it sounds like I'm feeling frustration, it is. I don't understand why I can't get a sentencing hearing that I usually try to get done within 3 to 5 weeks. Now I'm over 4 months. I'm no further now than I was before, and in all fairness the State isn't either because as part of--because the cooperation that was anticipated as part of the agreement isn't done yet and I don't know when this is going to be done. They've scheduled 2 or 3 of these polygraph--two I guess is what the argument was. Why do we have to schedule a third? I don't even understand that. To me, one would be enough. But then even assuming one isn't, two should be enough. When are we looking to schedule a third one? This is a rhetorical question and you don't need to respond, but are you looking to do it next summer, next August, make it the one year anniversary date that we schedule it? I don't agree. So the State's motion is granted. Counts 2, 3 and 4 are reinstated and we'll set the matter down then for a status date and set a trial date."

Defense counsel asked the trial court if it would accept an oral motion to withdraw defendant's plea of guilty to the second degree murder charge. The trial court refused and ordered defense counsel to file a written motion to withdraw the plea.

On January 24, 2006, defendant's counsel filed a motion to withdraw the guilty plea to the second degree murder charge. Counsel told the trial court that defendant wanted to leave the plea of guilty to obstructing justice undisturbed. The trial court did not address defendant; a certificate pursuant to Supreme Court Rule 604(d) (210 Ill. 2d R. 604(d)) was not filed. The trial court granted the motion to withdraw the plea, stating that "apparently it did not work out the way the parties had agreed upon."

### F. Jury Trial

The matter proceeded to a jury trial before Judge William Weir. The State told the jury in its opening statement that the evidence would demonstrate that three people were responsible for the death of the victim. The jury would get to see and listen to a recording of the police interview of defendant in which he explained what happened. The jury would further learn that defendant had cleaned blood out of his car. Defendant's counsel, Hiatt, countered in his opening statement that defendant was not out participating in gang activity, but was simply out with his friends, including the victim. Hiatt conceded that defendant had taken steps to "conceal or to minimize" his involvement by cleaning his car, but Hiatt noted that defendant had "accepted responsibility" for that conduct by pleading guilty to the charge of obstructing justice. Hiatt told the jury that fear of the other two men at the scene had motivated defendant to attempt to conceal his involvement.

Initially, the State recounted the December 4, 2004, discovery of the victim's body in rural Kendall County. The State also provided medical evidence about the manner of the victim's death. The testimony indicated that the victim had been shot four times--three times in the head and once in his torso. The torso wound was, by itself, a fatal wound, entering the victim's right shoulder at a downward angle, passing through his lung, severing his aorta, and exiting out the left side of his

back. The testimony also indicated that the victim had been beaten about the face and that his jaw had been shattered.

The State also presented testimony about the crime scene itself. The police photographed skid marks and tire impressions on the side of the roadway. Two .22-caliber shell casings and two .45-caliber shell casings were recovered from the scene. The presence of blood was detected at various spots along the road and in the grass along the ditch where the car had stopped. A blue hat was found a few feet away from the victim's body.

Witnesses Christina and John Melton testified that, on December 4, 2004, at around 7 or 7:30 p.m., they were introduced to defendant and the victim when they visited Rhonda Westenfelt's house. John identified a photograph of a silver Suzuki Forenza as the car he observed defendant and the victim arrive in that night. Lindsay Behrens testified that she was friends with defendant, Danny Casas, and Pineda. Behrens testified that they visited her house between 9:30 and 10 p.m., arriving in a silver car. Behrens testified that she observed no blood on them and no guns and did not think that they behaved unusually in any way.

Stephanie Beals, defendant's former girlfriend and the mother of his son, testified that she owned the silver Forenza, but that she and defendant shared its use. Beals testified that, during the afternoon of December 4, 2004, she, defendant, and the victim had driven around to several different places. About a week after that day, she notified the police that her car had been stolen from in front of defendant's home.

The State presented evidence that, on January 6, 2005, the car was discovered on a street in Aurora. It was then turned over to the Kendall County sheriff. A trooper from the state police, Monique Harms, examined the car, discovered several areas that potentially were stained with

human blood, and collected evidence from those areas. Forensic scientists analyzed the swabs and samples Harms had collected. A forensic biologist testified that two areas on the front passenger floor mat tested positive for human blood. A DNA analyst testified that the floor mat samples yielded nothing that could be successfully analyzed. The biologist testified that a quarter- to half-dollar-sized spot on the backseat also tested positive for human blood. The DNA analyst testified that the sample yielded a positive result and that it matched the victim's DNA profile. The DNA analyst testified that the blue hat also provided sufficient material to positively test. The results included a mixture of DNA from at least three people, but the major component of the mixture matched Pineda's DNA profile.

Ocon testified that, on December 5, 2004, defendant had visited her where she worked and told her that the victim had died. Ocon testified that defendant told her that "they killed him," but did not tell her who "they" were. Defendant also told her that they "were supposed to rough him around. That was it." Defendant further told her that "they took it too far." Ocon did not remember, but confirmed after being confronted with it, that she stated in her written statement to police that defendant told her that his job was to get close to the victim and gain his trust, and then they were going to jump him. On cross-examination, Ocon denied that defendant told her he knew that the victim was going to be shot. Defendant did not tell Ocon that he participated in what the other two passengers of the car had done. Defendant also did not tell Ocon that he cleaned blood from his car.

The State played a tape of a recorded phone conversation between defendant and an unidentified woman. Defendant told the woman that his car had been found. Defendant also told the woman that the floor of the car had been covered with blood and that he had to "scrub it good."

Detectives Eberhardt, Ratkovich, and Jasnosz all testified about their interviews with defendant. Jasnosz testified that, before he interviewed defendant on December 15, 2004, he had seen Ocon's written statement and knew that defendant was one of the last people seen with the victim on the evening of his death. The State played for the jury a portion of the recording of the interview between Jasnosz and defendant. Following the playing of the recording, the parties stipulated that defendant pleaded guilty to obstructing justice, and the indictment was read to the jury. The State rested. The trial court denied defendant's motion for a directed verdict. Defendant offered no witnesses on his behalf. The jury found defendant guilty of all charges.

### G. Posttrial Proceedings

On May 25, 2006, at 1 p.m., defendant was scheduled to be sentenced. At that time, when the court attempted to begin the sentencing hearing, neither Hiatt nor Weinert was present. Defendant told the trial court that his attorneys had not returned his phone calls and that he filed a pro se motion seeking to discharge Hiatt and Weinert because they were refusing to help him. Defendant also told the trial court that, on May 19, 2006, he filed several pro se motions. One of defendant's motions requested a new trial, due to ineffective assistance of counsel. That motion alleged that his plea agreement with the State had been lost due to counsel's failure to comply with the terms of the plea agreement.

At about 1:30 p.m., Hiatt arrived in the courtroom. Hiatt explained to the trial court that he had been delayed by road construction. The trial court asked if both sides were ready to proceed with the sentencing hearing. Hiatt orally moved for a continuance, representing that he and Weinert had not been able to contact defendant's family to discuss mitigation witnesses. The prosecutor objected,

arguing that it had been six weeks since the end of the trial, sufficient time for defense counsel to have contacted defendant in the jail.

The trial court questioned defendant about his pro se motions. Defendant explained that he had filed them because he had not heard from his attorneys and he was concerned that, if he did not take action, he would miss the 30-day deadline in which to file posttrial motions. Defendant told the trial court that, after the trial, he had had only a single minute-long phone conversation with Weinert. Defendant also noted that neither attorney had visited him, and he told the trial court that he felt that he had been abandoned by his attorneys.

The trial court allowed Hiatt to respond. Hiatt explained that it was difficult for him to drive up from his main office in Kankakee to Yorkville. Hiatt also informed the trial court that he had actually already filed a posttrial motion for defendant. Hiatt disagreed that he and Weinert had abandoned defendant, and he asserted that defendant felt that way only due to having been found guilty. Hiatt also blamed defendant for losing the benefit of the plea agreement, asserting that "[i]t was not because of anything Mr. Weinert or I did. It was because [defendant] was disingenuous and not forthcoming with the State's Attorney's Office."

The trial court noted that it was very concerned that Hiatt and Weinert had not met with defendant following the trial. The trial court further noted that Hiatt's posttrial motion contained obvious errors on its face, leading the court to express its concern "about the apparent lack of attention being given to this serious matter by these attorneys." The trial court continued the sentencing hearing and granted defendant's pro se motion to discharge Hiatt and Weinert. The trial court appointed two attorneys from the public defender's office to assist defendant with his posttrial motions and ordered that Hiatt and Weinert make themselves and their case files available to the

public defenders and that they continue to attend every hearing in this matter. At about 2:05 p.m., Weinert entered the courtroom, and the trial court noted this for the record.

The newly appointed public defenders divided their tasks. John McAdams handled the posttrial motions. McAdams filed a posttrial motion seeking to arrest the judgment, to enforce the plea agreement, or, alternatively, to receive a new trial. During the arrest-of-judgment portion of the posttrial motion, counsel argued that the trial court, Judge Wilson, erred in allowing the State to reinstate the previously dismissed first degree murder charges without first vacating the dismissal or without filing a new charging instrument. The parties provided extensive argument, and both admitted that they could not find cases dealing with the reinstatement of charges after a plea agreement. The trial court reserved its ruling on the issue and allowed the parties to conduct further research.

For the part of the motion seeking to enforce the plea agreement, McAdams argued that an evidentiary hearing was needed because the trial court (Judge Wilson) had allowed the first degree murder charges to be reinstated without making a factual determination about whether defendant had breached the plea agreement. The trial court agreed that this portion of the motion presented the issue of who, if anyone, breached the plea agreement.

At the evidentiary hearing on the issue of enforcing the plea agreement, Fletcher, now a former prosecutor, testified about the October 2005 plea agreement statement. Fletcher testified that she did not believe that defendant told her the truth about the shooting. Defendant made no inculpatory statements in the October 2005 interview, other than to admit that he cleaned blood from his car. In the first portion of the interview, defendant also omitted all reference to Pineda or even a fourth person in the car with Danny Casas, the victim, and himself. After a break, Fletcher

confronted defendant with the DNA evidence that demonstrated Pineda's presence at the scene, and defendant eventually admitted that Pineda had been present. Fletcher also testified that other statements made in the interview were inconsistent with the evidence, such as where the victim and Casas were standing at the time of the shooting, where the victim ran, and where defendant stopped the car.

Ratkovich and Eberhardt testified about their roles in the investigation and interviews of defendant. Additionally, Melissa Barnhart, the Kendall County State's Attorney, testified that it was she who authorized the motion to reinstate the first degree murder charges. Barnhart testified that the parties did not draft a written plea agreement, and she acknowledged that the State had not attempted to obtain a "lock-out statement" before offering the deal. Barnhart testified that defendant had related a number of different versions of the events before the guilty plea. After the October 2005 interview, Barnhart attempted to schedule polygraph examinations of defendant because she did not know if he was telling the truth. Barnhart testified that defendant agreed to take a polygraph examination, but he wanted his attorneys to be present. The polygraph examination never occurred because defendant's attorneys did not show up for either appointment.

For the portion of the posttrial motion seeking a new trial, McAdams argued that Hiatt and Weinert had provided ineffective assistance in three main ways. First, they did not make it a priority to facilitate defendant's plea agreement. Second, they did not follow the proper procedures or prepare for the State's motion to reinstate the first degree murder charges. Last, they counseled defendant to keep his plea of guilty to obstructing justice intact.

The trial court eventually denied defendant's posttrial motion. Regarding the first portion of the motion, disputing the procedure used to reinstate the first degree murder charges, the trial court ruled:

"This Court finds that the State's dismissal of charges against [defendant] was conditional upon [defendant] testifying truthfully as to the facts of the alleged crimes and murder of [the victim] and that when the defendant breached his plea agreement by not testifying truthfully, the charges were lying dormant, *** and the charges could be properly reinstated."

Regarding the second portion of the posttrial motion, whether defendant breached the plea agreement, the trial court adopted Fletcher's testimony and noted specifically defendant's initial omission of the presence of Pineda and defendant's placing of Casas to the left of the victim as supporting the conclusion that defendant's plea agreement statement conflicted with the physical evidence. The trial court held that defendant intentionally and knowingly breached his obligation under the plea agreement. With regard to the ineffectiveness claims, the trial court denied them without providing any analysis.

The matter proceeded immediately to the sentencing hearing. The State presented evidence, from a jailhouse informant fitted with a recording device, that defendant had threatened to kill Danny Casas and Detective Jasnosz while awaiting sentencing. Defendant presented several family members as witnesses in mitigation, all of whom commented on defendant's character with the family. Further, the trial court considered the victim impact statement of the victim's mother and defendant's statement in allocution. The trial court sentenced defendant to a 25-year term of

imprisonment for first degree murder and a concurrent 2-year term of imprisonment for obstructing justice. Defendant filed a timely notice of appeal.

After the notice of appeal had been filed, the trial court held a hearing on the public defender's motion seeking reimbursement from Hiatt and Weinert for the fees the public defender's office incurred after the trial. Hiatt did not appear before the trial court at the 10 a.m. scheduled start of the hearing, and the trial court issued a warrant for Hiatt's arrest, noting that he had repeatedly violated the trial court's orders. When Hiatt eventually arrived at about 11:10 a.m., the trial court informed him that it was going to forward the transcript of the hearing to the Attorney Registration and Disciplinary Commission (ARDC).

The trial court, after allowing testimony and hearing argument, concluded that it had no statutory authority to order Hiatt and Weinert to reimburse the public defender's office for the expenses it incurred in the posttrial representation of defendant. The trial court was disturbed that Hiatt and Weinert did not visit defendant even once after the trial, and it found their conduct to be unprofessional and lacking diligence. The trial court held that the conduct of the attorneys following the appointment of the public defender to represent defendant, failing to attend each subsequent hearing, constituted contempt of court, and it fined Weinert $250 and Hiatt $500.

## II. ANALYSIS

On appeal, defendant raises three issues. First, defendant argues that the trial court erred in failing to suppress the December 15, 2004, statements because they were elicited in violation of Miranda. Second, defendant argues that the plea agreement must be reinstated due to the State's improper repudiation of the agreement. Last, defendant argues that Hiatt and Weinert provided

ineffective assistance by failing to facilitate the plea agreement and not advising defendant to withdraw his plea of guilty to obstructing justice. We address each contention in turn.

## A. Suppression of Statements

Defendant argues that the trial court erred in denying his motion to suppress statements. Defendant argues first that, for the portion of the interview before he was given Miranda warnings, he was nevertheless in custody, and the Miranda warnings should have been given to him. Defendant also contends that the police used an impermissible "question first, warn later" technique to elicit inculpatory statements from defendant. Defendant also argues that, even though he was given Miranda warnings before making another inculpatory statement to Fletcher, the warnings were insufficient to attenuate the taint of the improperly adduced statement to Jasnosz.

### 1. Standard of review

Before addressing defendant's substantive arguments, we must first consider our standard of review. A trial court's ruling on a motion to suppress presents mixed questions of law and fact. People v. Gherna, 203 Ill. 2d 165, 175 (2003). A reviewing court will accord deference to the trial court's factual findings, disturbing them only if they are against the manifest weight of the evidence. People v. Braggs, 209 Ill. 2d 492, 505 (2003). The ultimate question of whether suppression is warranted is reviewed de novo. Braggs, 209 Ill. 2d at 505; Gherna, 203 Ill. 2d at 175. Further, in reviewing the trial court's ruling, a reviewing court may consider the entire record, including trial testimony. People v. Gilliam, 172 Ill. 2d 484, 501 (1996).

### 2. Violation of Miranda--Statements to Ratkovich and Jasnosz

As an initial matter, we note that the State asserts that the record is incomplete because the State introduced three Digital Video Discs (DVDs) of defendant's interviews, the trial court referred

to the three DVDs in its letter ruling, and the same three DVDs do not appear in the record--only the DVDs that were used at trial and at posttrial hearings were submitted with the record. Because the record is not complete, according to the State, we must affirm on that basis. We disagree. We note that the State does not assert that the recordings contained in the record do not accurately portray all of defendant's interviews with police. Further, the DVDs in the record were introduced at trial or at posttrial hearings, and we may consider the entire record in reviewing the trial court's ruling on the motion to suppress. Gilliam, 172 Ill. 2d at 501. Accordingly, we hold that the record is sufficiently complete with the inclusion of the trial and posttrial DVDs, which depict defendant's interviews with police, and we reject the State's contention to the contrary.

Defendant's initial contention is that his statements, particularly to Jasnosz, were made in a custodial setting that required the police to give him Miranda warnings. Defendant argues that, because Miranda warnings were not given to him until Fletcher interviewed him, the statements made to Ratkovich and Jasnosz were elicited in violation of Miranda and should be suppressed.

Defendant's initial challenge centers on the question of when he was in custody for the purposes of Miranda. This determination involves two discrete inquiries: the first is to determine what were the circumstances surrounding the questioning, and the second is to determine whether, given those circumstances, a reasonable person would have felt that he or she could not terminate the interview and leave. Braggs, 209 Ill. 2d at 505-06.

When looking at the circumstances surrounding an interrogation, a court will consider the following relevant factors in determining whether the statement was made in a custodial setting: "the location, time, length, mood, and mode of the interrogation, the number of police officers present, the presence or absence of the family and friends of the accused, any indicia of formal arrest, and the

age, intelligence, and mental makeup of the accused." Braggs, 209 Ill. 2d at 506. The subjective thoughts of the police or the individual being questioned are generally irrelevant unless the officer's belief that the individual is a suspect is communicated in some manner to him or her, in which case it becomes relevant to the extent it would affect how a reasonable person in the position of the individual would have gauged his or her freedom to terminate the interview and leave. Braggs, 209 Ill. 2d at 506-07. Additionally, if the officer is aware of unique traits of the individual that make him or her particularly vulnerable to the idea that he or she is in custody, and if the officer exploits them in questioning, then that too is a relevant factor in determining whether the individual is in custody for the purposes of Miranda. Braggs, 209 Ill. 2d at 506-07. We also note that the changing tenor of the interrogation may shift a voluntary encounter into a custodial one. See People v. Carroll, 318 Ill. App. 3d 135, 138-39 (2001) (the defendant voluntarily accompanied police for questioning, but the change from inquisitive to accusative questioning factored into the determination that the defendant was in custody for purposes of Miranda); People v. Savory, 105 Ill. App. 3d 1023, 1029 (1982) (the defendant was interviewed several times with the final interview being deemed custodial due to the change from inquisitive questioning to accusative questioning with the police contradicting and discounting the defendant's explanations).

### a. Factual circumstances

With these principles in mind, we turn first to the circumstances of defendant's interrogation. On December 15, 2004, defendant was intercepted by police as he was leaving work for the day. Ratkovich and Eberhardt asked defendant to come with them to the sheriff's office to undergo further questioning about the victim's death, which questioning would be recorded. Defendant agreed. He was dependent upon the police to take him to the sheriff's office and to return him to his home.

There is no indication, however, that he was restrained or manhandled in any way as he was taken first to the unmarked vehicle and then to the sheriff's office.

The recording of the interview shows that, once at the sheriff's office, defendant was installed in an interview room--a small room about eight feet square, with a window, a table, and three chairs. The interview room was on the second floor, about 50 feet from the front entrance. The officers testified that no keys were needed to open any doors between the interview room and the main doors of the office, although defendant would have needed to traverse stairs and the lobby in order to leave the sheriff's office. Defendant was interviewed by two police officers, but only one at a time. Defendant sat in the chair nearest the door, which was closed during questioning, and the interviewing officer sat in the chair nearest the window; the third chair was not visible on the recording. From time to time during the interview, an officer would knock at the door to the interview room, and the interviewing officer would open the door, receive whatever material was being offered, and return to the interrogation, closing the door.

The police offered defendant several breaks. At the first break, which occurred about an hour into the interrogation, defendant was apparently allowed to leave the room by himself and to use the restroom. However, the field of view of the camera recording the interview did not extend beyond the door to the interview room, so there is no way to see whether, once defendant exited the interview room, he was escorted to the restroom. When defendant returned to the interview room after the break, the door remained open and he was engaged by another officer, possibly Eberhardt, who talked with defendant about matters unrelated to the police investigation. By contrast, during any subsequent breaks, defendant would be left alone in the interview room (we note that defendant

-29-

made no further requests to use the restroom), the door was shut, and defendant remained under observation. There was no testimony about whether the interview room door was locked at any time.

The interview commenced at about 7 a.m., after defendant had worked his overnight shift at Eby-Brown. Ratkovich was first to question defendant. For the first 15 or 20 minutes of the interview, Ratkovich went over defendant's background information, like his education (he was home-schooled) and his family. After the first portion of the interview until the break was taken, Ratkovich asked defendant to tell him what happened on the day of December 4, when the victim was killed.

After about one hour, the Ratkovich portion of the interview took a decidedly different tone from the relatively friendly and nonconfrontational first hour. Ratkovich began by telling defendant that he had to ask him some questions like, did you do this, and why would you be named as a suspect. After being asked this series of questions, defendant lost his composure and stated that he was afraid that "they" would come at him. Defendant explained to Ratkovich that a young cousin of his had been killed when people were attempting to kill his uncle. The first break was taken.

When the interview resumed, at about the 1-hour-and-25-minute mark, Ratkovich confronted defendant with discrepancies in his story and told him that the police possessed evidence that showed that defendant had been at the scene of the victim's killing. Ratkovich also told defendant to tell him what actually happened, "or it will [all] come down on you." Defendant persisted in his story that he and the victim encountered rival gang members. Ratkovich told defendant that he was not being truthful and that his story did not add up.

A second break was taken and Jasnosz took over the interrogation at about the 1-hour-and-50-minute mark. Jasnosz started by telling defendant that he was accountable for what happened

to the victim. Additionally, Jasnosz showed defendant a picture of the electric chair and told defendant that he was facing it if some prosecutor wanted to make headlines. Jasnosz also likened defendant's situation to that of Scott Peterson, who had been convicted, according to Jasnosz, solely on the basis that his lies to police were exposed. Jasnosz also told defendant that he should be more afraid of what could happen to him as a result of the interrogation than of what anyone else involved in the victim's death could do to him.

Beginning at about the 2-hour-and-20-minute mark of the interview, defendant began to tell what had happened. At about 2 hours and 30 minutes into the interview, Jasnosz asked defendant to go over the story again. At about 2 hours and 40 minutes into the interview, defendant told Jasnosz that his job had been to wait in the car while the victim was beaten by Danny and "Muscles" (Pineda), whom he denied knowing. After defendant finishing recounting his story, at about 2 hours and 52 minutes into the interview, Jasnosz remarked that defendant had "criminal liability" for what had occurred. Jasnosz then confiscated defendant's shoes and socks. At about 2 hours and 56 minutes into the interview, Jasnosz returned and resumed questioning defendant, this time about the guns used and about his conversation with Ocon. Defendant asked when he could leave. Jasnosz put him off, saying that "other things" were happening that were beyond Jasnosz's control. Additionally, Koestner popped into the room and told defendant that he was not under arrest and asked him to stay just a bit longer. Defendant reluctantly agreed, claiming that he would not stay past 10:30.

Another break was taken while Jasnosz took away defendant's socks and shoes. The door to the room remained closed and defendant put his head down. At about 3 hours and 7 minutes into the interview, Jasnosz returned with Fletcher and told defendant that, "just for formality," because

it had not been done earlier, he would go over the Miranda warnings with defendant. At this point, defendant was read the Miranda form and he signed it, indicating that he would waive his rights.

b. Application of law

As noted above, the analysis of whether a defendant is in custody for purposes of Miranda proceeds in two steps. First, the court should considers all of the circumstances surrounding the questioning. Braggs, 209 Ill. 2d at 506. The relevant factors bearing on the custodial status of the defendant include "the location, time, length, mood, and mode of the interrogation, the number of police officers present, the presence or absence of the family and friends of the accused, any indicia of formal arrest, and the age, intelligence, and mental makeup of the accused." Braggs, 209 Ill. 2d at 506. After ascertaining the circumstances, the court must then ask whether, given those circumstances, a reasonable person would have felt that he or she could not terminate the interview and leave. Braggs, 209 Ill. 2d at 506.

The factors of location, time, length, mood, and mode of the interrogation ultimately favor a finding that defendant was in custody. Defendant was brought to the sheriff's office, an official setting that has been held to be inherently coercive. See, e.g., People v. Slater, 228 Ill. 2d 137, 156 (2008) (distinguishing between questioning occurring outside of police offices and that occurring within police offices, noting that questioning at the police station "would likely present a more foreboding, intimidating and adversarial environment"). Moreover, the official setting of the second interview at the sheriff's office contrasts strongly with the first interview that was undertaken at the Eby-Brown facility. Additionally, defendant was dependent upon the police to provide him with a way to leave the sheriff's office after the interview concluded. These factors are mitigated somewhat by the fact that, when he was interviewed the previous day, defendant was informed that he might

face follow-up questioning. Additionally, on December 15, 2004, defendant agreed to submit to the follow-up questioning at the sheriff's office. While these are considerations weighing against a finding of custody, we nevertheless conclude that they do not outweigh the other factors identified above. Therefore, we conclude that the location factor favors a finding of custody.

The time of the questioning also favors a finding of custody. Although defendant was questioned early in the morning, it was right after he had completed his overnight shift at Eby-Brown. Defendant was given no time to rest or refresh himself but was taken directly from his work to the sheriff's office. This is borne out by noting that, during some of the breaks, defendant appeared obviously drowsy and also appeared to have dozed off. We note, on the other hand, that the time of questioning, while early in an absolute sense, was equivalent to the early evening for a worker on a normal day shift. While this might disfavor a finding of custody, we nevertheless conclude that the time factor weighs in favor of a custody finding because of defendant's obvious fatigue during the questioning.

The length of the interrogation is a neutral factor here. The questioning by Ratkovich and Jasnosz lasted a total of about three hours. Defendant was subjected to the questioning immediately after having worked a full overnight shift. While defendant makes no specific argument pertaining to the length of the questioning, we note that defendant repeatedly complained about how long the interview was taking, asking when he could leave, and that the questioning was intensive and nearly continuous, with breaks amounting to less than 20 to 30 minutes out of the three-hour period of questioning. In spite of defendant's complaints and the unbroken nature of the interview, we conclude that three hours is not an unduly long time for questioning to last and that the police were solicitous of defendant's needs during that relatively brief time. Because of the countervailing

considerations of the brief time and the unbroken nature of the questioning, we conclude that the length of the interrogation is a neutral factor in the analysis.

The mood of the questioning changed from the initial relatively friendly and nonconfrontational background questioning by Ratkovich in the first hour of the session, to a confrontational and accusative tone of questioning in the second and third hours of the session. After the first break, Ratkovich began to dispute defendant's version of the events, telling him that his story did not add up. While we note that, at the beginning of the second part of Ratkovich's interview, his tone appeared almost apologetic as he asked defendant, "Not to be accusatory, but did you do it," and "why would someone name you as a suspect," the questions, nevertheless, were accusatory. Ratkovich also admonished defendant to tell him what actually happened, "or it will [all] come down on you," meaning all of the criminal liability in this matter. When Jasnosz took over the questioning, he immediately opened his portion with the statement to defendant that "you are accountable for what has taken place." During the Jasnosz portion of the interrogation, he unrelentingly pushed defendant to tell him what happened, alternating between scare tactics, like showing defendant a picture of an electric chair, and pleas for help. However, the accusations of liability by Ratkovich ("it will come down on you") and Jasnosz ("you are accountable for what has taken place") were clear statements by the police that defendant was a suspect and that this was an investigation not into what defendant witnessed, but into defendant's criminal liability for the shooting death of the victim. While the subjective beliefs of the police generally are not relevant, their beliefs may become relevant when communicated to the defendant. Braggs, 209 Ill. 2d at 506-07. Here, Ratkovich and Jasnosz both communicated to defendant his status as the one who would face the entire criminal liability for the victim's murder if he did not cooperate. In addition, as noted under the length-of-

interrogation factor, the questioning was only very briefly interrupted for breaks, which, in our view, increased the intensity of the adversarial and accusatory aspects of the interview. We conclude that the mood factor, especially the changing tenor from inquisitory to accusatory, as in Carroll and Savory, weighs heavily in favor of a finding that defendant was in custody for purposes of Miranda during the second half of the Ratkovich portion of the questioning and continuing into the Jasnosz portion of the questioning.

We note, however, that, although the questions became accusatory and the questioning began to take on a badgering style, the police were also obviously interested in learning details concerning the others involved in the shooting. Ratkovich, in addition to warning defendant that "it will [all] come down on you," was pressing defendant to reveal the shooter's identity. Likewise, Jasnosz clearly attempted to convince defendant to become a State witness and reveal the name of the shooter and the details of the crime. While these considerations deflect the mood factor away from a finding of custody, we conclude that the accusatory aspects of the questioning remain most important. Indeed, it is apparent that the police were attempting to obtain an inculpatory statement from defendant in order to gain greater leverage over him so that he would testify against his cohorts in order to save himself. While we acknowledge the inquisitory aspects that permeated defendant's questioning, we nevertheless believe that the change from the original easy-going questioning to the far more disputatious and accusatory nature of the interview following the first break, along with the continuous nature of the questioning, tip the mood factor firmly toward a finding of custody.

The mode of the interrogation is a relatively neutral factor. Defendant was interviewed by one officer at a time. He was interviewed in a small interview room, monitored and recorded by a camera in plain sight. In general, the door to the room was closed during questioning. At the first

break, the door was opened and defendant was allowed to use the restroom. An officer chit-chatted with defendant until Ratkovich returned. When questioning resumed, it acquired an accusative tenor and, in the second and subsequent breaks, the door was closed. No officers came to talk with defendant about unrelated matters. There was, however, no evidence that the door was locked or that defendant would have been prevented from leaving the room. Sergeant Koestner even entered the room during the Jasnosz portion of the interrogation to assure defendant that he was not yet under arrest and to ask him to stay a bit longer and continue talking with the police. Considering all of the circumstances bearing on the mode of interrogation, we conclude that it neither favors nor disfavors a finding of custody for purposes of Miranda.

The number of police officers present does not favor a finding of custody. Defendant was questioned by one officer at a time. Other officers were clearly present, but they generally did not enter the interview room while the questioning was being conducted.

Defendant was isolated from family. The police drove him to the sheriff's office, and no family was present at any time during the questioning. However, defendant did not ask for the presence of any family. This factor is fairly neutral toward a finding of custody.

The remaining factors disfavor a finding of custody. There were no indicia of formal arrest. Defendant was not restrained or handcuffed. The officers did not tell defendant he was under arrest, and Sergeant Koestner told defendant that he was not under arrest when defendant became agitated during the Jasnosz portion of the interrogation. At about the 2-hour-and-50-minute mark, when Jasnosz took defendant's shoes and socks, was the first time during the questioning that it became impracticable for defendant to leave the sheriff's office, because he was barefoot. Defendant also

was 19 years old, and he demonstrated that he was reasonably intelligent and able to follow the proceedings and was not obviously vulnerable to the blandishments of the officers questioning him.

Our review of the factors used in considering the circumstances of the interrogation reveals that they do not uniformly point to a single result. Among the factors, however, the change in the tenor of questioning from inquisitive to accusative stands out. Thus, on balance, we conclude that the circumstances of the interrogation favor a finding that, when the tenor of the questioning changed from inquisitive to accusative during the second hour of the session, defendant was in custody for the purposes of Miranda, notwithstanding the statement of Koestner that defendant was not under arrest. Next, we must consider whether a reasonable person in defendant's circumstances would have considered himself to be in custody. Braggs, 209 Ill. 2d at 506.

At the outset of the December 15, 2004, interview, a reasonable person would not have believed that he was in custody. The officers asked defendant to accompany them and promised to give him a ride to wherever he needed to go when the interview was over. Defendant was not handcuffed or otherwise restrained as he was taken in an unmarked car to the sheriff's office.

Likewise, a reasonable person would not have believed that he was in custody during the first half of the Ratkovich portion of the interview. Ratkovich's demeanor was genial and business-like; the questions he posed were focused on defendant's background as well as seeking information about defendant's and the victim's activities on December 4, 2004, without offering any comments or contradictions as defendant answered the questions. At the first break, defendant was allowed to leave the interview room to go to the restroom. Defendant returned to the interview room by himself, and the door to the interview room remained open. Another officer engaged defendant in conversation about topics unrelated to the victim's death.

Upon the resumption of the interview, a reasonable person still would not have believed he was in custody. However, upon resuming his questioning, Ratkovich immediately confronted defendant with discrepancies in his story and told him that the police possessed evidence that showed that defendant had been at the scene of the victim's killing. Ratkovich also told defendant to tell him what actually happened, "or it will [all] come down on you." At this point, a reasonable person would have understood that he was the focus of the police investigation and, having been told "it will come down on you," might have begun to doubt that he could terminate the interview and leave. While defendant persisted in his story that he and the victim encountered rival gang members, Ratkovich told defendant that he was not being truthful and that his story did not add up. Another break was taken.

When Jasnosz resumed the questioning, he immediately told defendant that he was accountable for what happened to the victim. Jasnosz also told defendant that he did not believe his statement and that he was in a position similar to Scott Peterson, who, according to Jasnosz, had been convicted solely because his lies to police had been exposed. Jasnosz also warned defendant that a headline-seeking prosecutor could send him to the electric chair as a result of his involvement in the death of the victim. At this point, a reasonable person, faced with the knowledge that the police believed him to be criminally liable for the murder of the victim, and confronted with the express disbelief of his explanations of his and the victim's activities during December 4, 2004, would not have believed that he could terminate the interview and leave the station. Accordingly, we hold that, at the beginning of the Jasnosz portion of the interview, before defendant made inculpatory statements, a reasonable person in defendant's circumstances would have believed himself to be in custody for purposes of Miranda. We note that the trial court acknowledged this

status when it noted that "[t]he initial interview by [D]etective Jasnosz, while in the beginning was clearly voluntary, progressed to a point where Miranda certainly should have been considered." Nevertheless, the trial court did not order the statements suppressed. Because defendant was in custody for the purposes of Miranda, he should have been accorded the Miranda warnings at this point. We hold that the trial court erred in refusing to suppress defendant's statements to Jasnosz.

Our conclusion is supported by Carroll and Savory. In Carroll, the defendant voluntarily accompanied the police to the station, was repeatedly informed that he was free to leave, and was not restrained. Carroll, 318 Ill. App. 3d at 139. Despite this, the court held that the defendant was in custody, because the defendant was aware that the investigation focused solely on him and the defendant had already given an inculpatory statement. Carroll, 318 Ill. App. 3d at 139. Thus, in spite of the assurances given by the police, the court held that the changing nature of the questioning required the police to give the defendant Miranda warnings. Carroll, 318 Ill. App. 3d at 139.

The State attempts to distinguish Carroll on the basis that the defendant gave an inculpatory oral statement before giving a recorded statement that was suppressed, and neither of the statements was warned. While this is true, it does not deal with the fact that, during the course of the interrogation, the police disbelieved the defendant's version of the events until he made his inculpatory oral statement. The accusative nature of the questioning, and the defendant's knowledge that the police were seeking to place upon him the criminal liability for the death of his brother, are the key factors in the court's decision. The fact that the defendant gave an unwarned inculpatory statement before giving the unwarned recorded statement that was suppressed does not affect the key factors relied upon by the court.

In Savory, the 14-year-old defendant was interviewed four times before being given Miranda warnings. Savory, 105 Ill. App. 3d at 1026-27. The court held that the first interview, which occurred at the defendant's school and was inquisitory, was noncustodial. Savory, 105 Ill. App. 3d at 1029. Likewise, the second interview, which was held at the police station and was also inquisitory and did not focus on the defendant as the offender, was also noncustodial. Savory, 105 Ill. App. 3d at 1029. The third interview was held to be custodial because the questioning changed from inquisitive to accusative, the defendant had been at the police station for over two hours, the officers testified that the defendant was not free to leave (although the defendant was not so informed), and the defendant was 14 years of age. Savory, 105 Ill. App. 3d at 1029. The change from seeking information to accusatory questioning, and confronting the defendant with discrepancies between his story and the evidence the police held, led the court to conclude that the defendant was in custody for the purposes of Miranda. Savory, 105 Ill. App. 3d at 1029.

The State attempts to distinguish Savory on the basis of the defendant's age and the officers' belief that the defendant was not free to leave the station. In fact, however, the court said that these factors possessed "some relevance" to the custody inquiry, but it relied more heavily on the change from inquisitive questioning to accusative interrogation. We do not believe that the State has sufficiently distinguished Savory to make our reliance upon it improper.

As in Carroll and Savory, the change in the questioning from inquisitory to accusatory leads us to conclude that defendant was in custody within the first few minutes of the Jasnosz portion of the December 15, 2004, interview. The State's attempt to distinguish Carroll and Savory is unavailing.

The State argues that defendant was not in custody for purposes of Miranda, because the questioning by both Ratkovich and Jasnosz was inquisitory, seeking to cajole a reluctant witness into being forthcoming. We disagree. While we agree that Ratkovich's questions after the first break, such as, did you do this, and why would you be named as a suspect, were conveyed in a business-like manner, they were still accusative questions. They prompted defendant to admit that he was scared of retaliation if he were to say anything about the victim's death. Additionally, the subjective belief of the police is not relevant unless they communicate their belief to the defendant. Braggs, 209 Ill. 2d at 506-07. Here, Ratkovich admonished defendant that he better come up with a better story, otherwise "it will [all] come down on you." He also cautioned defendant about being the one to face a Kendall County judge for the death of the victim. Jasnosz also began his questioning in an accusatory style, noting that defendant was responsible for the victim's death and warning him that he could face the death penalty if the prosecutor were looking to get his name in the paper. Based on our review of the record and all of the circumstances surrounding defendant's interrogation, we reject the State's explanation that Ratkovich and Jasnosz were questioning defendant as a reluctant witness. Both knew from the outset that defendant had admitted to Ocon that he had been involved in the plan to beat up the victim. Both knew that this made defendant accountable for the murder, and both communicated this fact to defendant. Accordingly, we reject the State's reluctant-witness characterization of the December 15, 2004, interrogation.

The State also suggests that this case is more analogous to People v. Croom, 379 Ill. App. 3d 341 (2008), than to any other case cited by defendant and that, as a result, we should follow its guidance rather than that of Carroll or Savory. In Croom, the 16-year-old defendant was convicted of first degree murder, having struck his girlfriend's 3-year-old son in the abdomen. Croom, 379 Ill.

App. 3d at 342. The defendant was interviewed by two officers in an unmarked van (with no police radio or cage in which to confine suspects) on the city streets for three or four hours. Croom, 379 Ill. App. 3d at 351. The trial court found that the defendant chose to get into the van with the officers and that the defendant was not handcuffed or searched, and there were no other indicia of arrest present. Croom, 379 Ill. App. 3d at 352. During the questioning, the officers discounted the defendant's version of the events, and the defendant became increasingly upset until he began crying and stated, " 'I did it. I can't do this. I want to talk to my mom. I want to go home.' " Croom, 379 Ill. App. 3d at 344. The officers drove the defendant toward his home, showing the defendant a picture of the victim's body prior to the autopsy. The defendant became extremely upset and was yelling and crying. Croom, 379 Ill. App. 3d at 343-44. When they arrived at the defendant's home, one of the officers asked the defendant if anything had happened to the victim that could have caused his injuries. The defendant did not leave, but answered the question, taking the police to a playground and pointing out some of the equipment that he claimed caused the victim's injuries. Croom, 379 Ill. App. 3d at 344.

The court concluded that the defendant was not in custody for purposes of Miranda. It reasoned that the location of the interrogation, coupled with the fact that the defendant was not physically prevented from exiting the vehicle, plus the mood of the interrogation all combined to render the questioning noncustodial. Croom, 379 Ill. App. 3d at 351-52.

In arguing that we should follow Croom, the State notes that Jasnosz's showing defendant a picture of the victim's body, the length of time of the interview, and the lack of restraint on defendant and his ability to move about in the sheriff's office particularly coincide with the facts of Croom. While these are points of similarity, we nevertheless find Croom to be distinguishable.

-42-

While the police in Croom discounted the defendant's story, the court found that "the record [did] not reflect that the mood of the interrogation was such that reversal of the trial court's decision is warranted." Croom, 379 Ill. App. 3d at 352. Here, by contrast, Ratkovich, during the second hour of his questioning, began to discount and dispute defendant's narrative of the events of December 4, 2004. In addition, Ratkovich began to warn defendant that he was facing significant criminal liability for his involvement. Likewise, Jasnosz told defendant that he was accountable for the victim's death. These statements were clearly accusatory and transformed the mood of the interrogation from inquisitory to accusatory. In Croom, there was no similar turning point; instead, the court suggested that the defendant's emotional reactions led him to say that " '[he] did it.' " Croom, 379 Ill. App. 3d at 344. There was no indication that the police similarly told the Croom defendant that he was liable for the victim's death as both Ratkovich and Jasnosz did here. Accordingly, we find Croom to be distinguishable.

### 3. Violation of Miranda--Statement to Fletcher

Having resolved the issue with the statement to Jasnosz, we must also consider whether the "Mirandized" statement to Fletcher should have been suppressed. While the State did not use the statement to Fletcher at trial, defendant placed the issue before the trial court in his motion to suppress statements, and the trial court ruled that the Fletcher statement was admissible. Additionally, in this appeal, the parties have fully addressed and briefed the issue of the admissibility of the statement to Fletcher. Accordingly, and as a matter of judicial economy, we will address the issue.

Usually, where an unwarned statement is suppressed, a later, warned statement will generally be admissible, because the Miranda warnings will be deemed to have removed the conditions that

precluded the admission of the unwarned statement. People v. Lopez, 229 Ill. 2d 322, 356-57 (2008), quoting Oregon v. Elstad, 470 U.S. 298, 314, 84 L. Ed. 2d 222, 235, 105 S. Ct. 1285, 1296 (1985). The general situation does not apply, however, where it can be determined that the police deliberately employed a "question first, warn later" interrogation strategy. If such a strategy was deliberately used, then statements made after Miranda warnings were given would still be excluded unless curative measures had been taken. Lopez, 229 Ill. 2d at 358-59, quoting Missouri v. Seibert, 542 U.S. 600, 622, 159 L. Ed. 2d 643, 661, 124 S. Ct. 2601, 2616 (2004) (Kennedy, J., concurring). Defendant argues that the police used a deliberate "question first, warn later" strategy in order to obtain defendant's inculpatory statement. The State argues that there is no evidence that the police deliberately employed that interrogation strategy. Instead, the police were questioning a reluctant witness and did not realize what, if any, involvement defendant had in the murder of the victim.

Our supreme court recently considered this precise issue in Lopez. There, the defendant voluntarily accompanied police to the station for questioning. Lopez, 229 Ill. 2d at 353. The court held, however, that the defendant's continued presence in the interview room (the defendant believed himself to be locked in the interview room), the police failure to advise the defendant he was free to leave, and the fact that the defendant was held in the interview room for four hours without contact with family despite the fact that the defendant's family was calling to obtain information about the defendant's status, rendered the seizure of the defendant unlawful and involuntary. Lopez, 229 Ill. 2d at 353-54. Our supreme court then considered whether the defendant's handwritten statement, taken after the illegal seizure, was admissible. In passing upon the admissibility of the subsequent handwritten statement, the court adopted Justice Kennedy's analysis in Seibert. Lopez, 229 Ill. 2d at 357-61. The court defined a two-step inquiry into the handwritten statement: first, the

court must determine whether the police deliberately used a "question first, warn later" interrogation strategy. If there is no evidence supporting a finding of deliberateness, then the analysis ends and the statement will be admissible. If there is evidence to support a finding of deliberateness, then the court must next consider whether curative measures were taken. Lopez, 229 Ill. 2d at 360-61. Our supreme court was aware that police officers generally will not admit on the record to using a "question first, warn later" interrogation technique in order to secure a confession. Lopez, 229 Ill. 2d at 361. However, by considering the objective evidence plus any subjective evidence, like an officer's testimony, the court may be able to determine whether the "question first, warn later" strategy was employed to circumvent Miranda. Lopez, 229 Ill. 2d at 361. To review the objective evidence, the court set forth the following factors for consideration: the timing, setting, and completeness of the unwarned interrogation, the continuity of police personnel, and the overlapping content of the unwarned and warned statements. Lopez, 229 Ill. 2d at 361, quoting United States v. Williams, 435 F.3d 1148, 1159 (9th Cir. 2006). With these principles in mind, we turn to the evidence in this case.

Initially, we consider the objective evidence. Defendant agreed to be taken to the sheriff's office. At about 7 a.m., he was placed in an interview room where Ratkovich began the questioning. Defendant was asked to describe the events of December 4, 2004, and was not interrupted or contradicted as he answered questions for the first hour. After a brief break, Ratkovich resumed questioning, this time in a more confrontational style. Ratkovich began challenging defendant's statements and warning defendant that "it will [all] come down on you" if defendant did not agree to cooperate with the police. At about 1 hour and 50 minutes into the interview, Ratkovich left and

Jasnosz replaced him, beginning his portion of the questioning by telling defendant that he was "accountable for what has taken place."

Eventually, at about 2 hours and 25 minutes into the interview, defendant gave an incriminating statement, admitting he had driven the car and knew that the victim was to be beaten. Jasnosz did not give defendant Miranda warnings at this point. Instead, he asked defendant to go over the story again, starting at the beginning. Defendant provided essentially the same incriminating statement, answering a few clarifying questions posed by Jasnosz. At about 2 hours and 50 minutes into the interview, Jasnosz took defendant's shoes and socks into evidence. At about three hours into the interview, Jasnosz gave defendant Miranda warnings, saying that it was "just for formality." Defendant then gave a third statement, this time with Fletcher asking the questions. The statement was substantially similar to the previous two unwarned statements. After defendant gave his statement to Fletcher, the interview was terminated, and defendant was handcuffed and led out of the interview room.

As to the subjective evidence, both Ratkovich and Jasnosz denied that they were attempting to elicit an inculpatory statement from defendant. Instead, both testified that they were seeking leads in solving the victim's murder. Both also indicated that defendant was free to leave the interview at any time. Jasnosz testified that he knew defendant had not yet received Miranda warnings when he began his portion of the questioning, but he did not explain why he did not give defendant warnings until after defendant had already made two substantially similar inculpatory statements.

Viewing the objective and subjective evidence in its totality, we conclude that it supports an inference that the police deliberately engaged in a "question first, warn later" interrogation strategy. Although Ratkovich testified that he did not have probable cause to arrest defendant, that statement

is belied by the fact that the police had taken a written statement from Ocon in which she stated that defendant told her that his job was to get close to the victim so that the victim's fellow gang members could administer a beating. This statement gave the police probable cause to arrest defendant. The existence of Ocon's statement also belies the testimony of Ratkovich and Jasnosz that they were treating defendant as a witness and did not know that he was involved in any way. Instead, the Ocon statement shows that the police knew, by the time the December 15, 2004, interview commenced, that defendant was at least accountable for the murder of the victim. Likewise, Ratkovich's admonition that "it will [all] come down on you," and Jasnosz's assertion that defendant was "accountable for what has taken place," demonstrate that they were fully aware that defendant faced the full criminal liability for the victim's death in this case. We also note that the trial court rendered no factual findings regarding the motion to suppress. Instead, it denied the motion, finding only that there was no coercion or trickery used to elicit defendant's statements.

Our supreme court noted, in Lopez, 229 Ill. 2d at 364, that an officer might mistakenly withhold Miranda warnings because he may not realize that a suspect is in custody and warnings are necessary, or he may not plan to question the suspect, or he may be waiting for a more appropriate time. Here, however, the evidence does not support an inference of mistake. Certainly, after defendant inculpated himself at about 2 hours and 25 minutes into the interview, the police knew that Miranda warnings were required. Yet, instead of giving the warnings, Jasnosz asked defendant to go through the story another time. Accordingly, we find that the objective and subjective evidence in the record supports the inference that the police deliberately employed a "question first, warn later" interrogation strategy and withheld Miranda warnings from defendant.

Having found the deliberate use of the "question first, warn later" strategy, we must now consider whether any curative measures were taken to make admissible the statement to Fletcher. Our supreme court noted that, for this step of the inquiry, the "relevant question is whether, after receiving midstream <u>Miranda</u> warnings, a reasonable person, in defendant's situation, would have understood that he retained a choice about continuing to talk to police." <u>Lopez</u>, 229 Ill. 2d at 364. The court adopted the factors set forth by the <u>Seibert</u> plurality and Justice Kennedy's concurrence. <u>Lopez</u>, 229 Ill. 2d at 364-65. These include the passage of time between the unwarned and warned statements, the location where the statements were taken, whether the questioning for the unwarned and warned statements was conducted by the same person, whether details from the unwarned statement were used during the questioning following the warnings, whether the suspect was told that the unwarned statement was likely to be inadmissible against him, and whether it was reasonable to look at the unwarned and warned interviews as parts of a continuum, in which it would have been unnatural to refuse to repeat the statement during the questioning following the warnings. <u>Lopez</u>, 229 Ill. 2d at 365.

With these factors in mind, we consider the circumstances of defendant's unwarned and warned statements. Defendant gave an unwarned, inculpatory statement at about 2 hours and 25 minutes into the interview. Defendant gave a second unwarned statement at about 2 hours and 35 minutes into the interview. At about three hours into the interview, defendant received <u>Miranda</u> warnings and thereafter gave his third statement. Additionally, Jasnosz minimized the impact of the warnings by stating that he was administering them "just for formality." Defendant remained in the same interview room throughout all of the questioning and statements. Jasnosz was present for each

of the three inculpatory statements, although Fletcher conducted the questioning for the third, warned statement. Defendant was not told that the two unwarned statements could not be used against him.

Summing up, the statement to Fletcher was taken closely in time to the unwarned statements, the statements were given in the same place, Jasnosz was present for each of the statements, and defendant was never advised that the unwarned statements were likely inadmissible. Additionally, the impact of the warnings was significantly undermined by Jasnosz's characterization that they were just a formality. From this, we cannot conclude that a reasonable person in defendant's position would have understood that he had a genuine choice about whether to continue to speak with the police. Accordingly, defendant's statement to Fletcher was not voluntary and should have been suppressed. Lopez, 229 Ill. 2d at 366.

The State argues that the Miranda warnings were sufficiently curative to allow the admission of the statement to Fletcher. We disagree. We note that the State argues only that Ratkovich and Jasnosz did not deliberately withhold the Miranda warnings during their questioning. We reject this contention, noting that the argument overlooks the fact that the knowledge of the Ocon statement, in which she related that defendant had admitted that his job was to get close to the victim so he could take the victim to be beaten by the victim's fellow gang members, is imputed to all police, including Ratkovich and Jasnosz. This knowledge directly contradicts their testimony in which they asserted that they did not know defendant's involvement in the murder, but were instead only seeking leads to complete the investigation. This knowledge that they had probable cause to arrest defendant at any time strongly supports the finding that they deliberately engaged in the "question first, warn later" interrogation strategy. We reject the State's argument.

We have determined that defendant was in custody for purposes of <u>Miranda</u> after Jasnosz told him that he was "accountable for what ha[d] taken place," and before he made any inculpatory statement to the police. In considering the admissibility of the statement to Fletcher, we have determined that it was involuntary, coming hard on the heels of the two inadmissible unwarned statements. As a result, we hold that the trial court erred in denying defendant's motion to suppress. Due to this error, we vacate defendant's murder conviction and remand the cause for a new trial.

### B. Plea Agreement

Defendant's next issue on appeal is that the State improperly repudiated the plea agreement before defendant was given the chance to fulfill his portion of the agreement. We address the argument because defendant has requested that his plea agreement be reinstated. Defendant notes that the trial court did not follow proper procedures in allowing the State to reinstate the first degree murder prosecution following the acceptance of the plea agreement. However, defendant does not present any actual argument regarding how the unusual procedures resulted in prejudice. Accordingly, we need not further address the out-of-order evidentiary hearing regarding defendant's breach of the plea agreement or the allowance of the State's motion to reinstate without first requiring that the plea be vacated. Defendant also argues that the plea agreement was vague and ambiguous and that the State failed to prove that defendant breached the terms of the agreement. We consider those contentions in turn.

Plea agreements are governed to some extent by principles of contract law, keeping in mind that the "contract" right is constitutionally based and reflects concerns that are fundamentally different from and wider than those of commercial contract law. <u>People v. Evans</u>, 174 Ill. 2d 320, 326 (1996). Contract law principles applied to a plea agreement may, in some circumstances, require

modification because of the constitutional rights underpinning the agreement. Evans, 174 Ill. 2d at 327. The existence of a plea agreement and its terms are questions of fact that must be decided by the trier of fact; those determinations will not be disturbed unless they are contrary to the manifest weight of the evidence. People v. Navarroli, 121 Ill. 2d 516, 521-22 (1988). The standard of review for whether a defendant breached his plea agreement does not appear settled in Illinois law. The State argues that a defendant's breach should be reviewed under the manifest-weight-of-the-evidence standard, citing Navarroli, 121 Ill. 2d at 521-22. Defendant argues that the issue should be reviewed de novo. United States v. Williams, 510 F.3d 416, 424 (3rd Cir. 2007) ("We will review the question whether a defendant breaches his plea agreement de novo"). We need not decide the standard of review, however, because, under either standard, we would conclude that defendant breached the plea agreement.

On August 5, 2005, defendant informed the court that he had agreed to enter a guilty plea to second degree murder and obstructing justice, in exchange for which the State would drop the first degree murder charges. While there was no agreement about the sentencing, the plea agreement contained the following additional terms, as stated by the prosecutor on the record:

"[D]efendant would in fact agree to cooperate with law enforcement through either the Kendall County Sheriff's Office or Kendall County State's Attorneys [sic] Office regarding information that has previously been tendered to the State regarding this case and individuals involved in this case both known and unknown at this time, that he would also agree to testify as necessary as directed by the Kendall County State's Attorneys [sic] Office in any trial regarding this matter for individuals known or unknown at this time at the request of the State's Attorneys [sic] Office and make them available for that."

There was no written agreement embodying the terms of the plea agreement.

Defendant attacks the plea agreement, as related by the prosecutor, as vague and ambiguous. Defendant argues that "cooperate with law enforcement" is undefined and ambiguous. Defendant also argues that "information that has previously been tendered" is also undefined and, without any definition, is virtually meaningless. Defendant also argues that the agreement did not place him on notice of what his obligations under it would be or even provide that he was required to give full, complete, and truthful information to law enforcement authorities.

The State disagrees, noting that "cooperate" is a common word with a well-understood meaning. The State argues that, at a minimum, the agreement clearly calls for defendant not to lie about the offense or withhold information from the authorities. The State also contends that "information that has previously been tendered" refers to defendant's statements about the individuals involved in the offense.

While the plea agreement was not precise and did not define the behavior necessary to constitute cooperation, we nevertheless believe that, at a minimum, it obligated defendant to provide truthful information about the events of the offense. To withhold information or to provide false information cannot be construed in any fashion as "cooperation." Webster's Third New International Dictionary 501 (1993) (cooperate defined as "1: to act or work with another or others to a common end"). If defendant were to lie to or withhold information from the police, then he would not be working toward the common end of bringing the other participants to justice. Instead, he would be working toward his own ends or, perhaps, those of the other participants. Whatever its faults, the plea agreement, at the very minimum, required defendant to tell law enforcement authorities the truth about the offense. If the State is able to demonstrate that the plea agreement statement is false in a

material way, or omits material information, then, notwithstanding the asserted vagueness and imprecision of the plea agreement, the State will have demonstrated that defendant breached the agreement.

In the plea agreement statement, defendant initially omitted all mention of Pineda. Yet in the December 15, 2004, interview, defendant had explained that Pineda rode in the backseat with the victim and began punching him as he pulled over to the side of the road. Defendant further described that Pineda and the victim tussled outside the car and that, when the victim appeared to be producing a gun, Casas shot the victim. We note, too, that this version conforms to some of the physical evidence, because Pineda's cap was found on the roadway near the victim, supporting the statement that he and the victim fought outside the car.

Additionally, in the December 20, 2004, interview, defendant acknowledged that two others accompanied him and the victim as he drove to the scene of the offense. Defendant omitted Pineda's name and, when asked by Jasnosz, defendant refused to mention Pineda, indicating that he was fearful of the consequences if he did so.

In the plea agreement statement, defendant was confronted over the presence of Pineda. Defendant continued to maintain that he could not testify about Pineda.

Based on these discrepancies, we hold that defendant's omission of the presence of Pineda at all during the offense constituted a substantial omission and a breach of the plea agreement. The trial court thus properly determined that defendant's omission of Pineda's presence during the offense constituted a breach of the plea agreement sufficient to allow the State to repudiate the plea agreement.

The State also notes that the plea agreement statement placed Casas, the shooter, to the left of the victim, yet the victim was shot in the right shoulder. Defendant counters that, if the shooting occurred on the passenger-side of the car, then Casas and the victim might have been in the correct positions according to the physical evidence. Defendant's argument is unavailing, however, because defendant, in the plea agreement statement, described the events with Casas being to the left of the victim, insofar as we can discern. Defendant's contention is an after-the-fact justification and does not appear to be supported by his plea agreement statement. In addition, in the first portion of the plea agreement interview, defendant did not give a reason why Casas would shoot the victim. After his initial statement was challenged, defendant explained that Casas shot the victim because the victim was one of the people who had beaten up Casas' mother. Defendant explained that he had learned this after he was incarcerated. Defendant did not, however, reveal why this explanation was not included in his initial statement that day.

Additionally, defendant was further inconsistent between the initial plea agreement statement and the second plea agreement statement, which he made after he was confronted with his prior statements and the physical evidence. Defendant initially stated that he stopped the car in the middle of the road. He was confronted with the evidence of the skid marks and changed his statement to conform to the evidence. Defendant also initially stated that, after the offense, he let Casas out of the car on Boulder Hill. Later, in the second portion of the interview, defendant admitted that he did not go to Boulder Hill, but instead drove to the house of Casas' girlfriend, where Casas changed clothes and disposed of everything related to the offense.

Regardless of which, if any, of the December statements were truthful, defendant provided two statements at the plea agreement interview that were inconsistent. Thus, by not providing

truthful and complete information, he did not cooperate with the police, and he breached the plea agreement.

Defendant argues that, during the cross-examination of Barnhart and Fletcher in the posttrial evidentiary hearing, they conceded that defendant's plea agreement statement was not necessarily inconsistent with the physical evidence. Nevertheless, defendant does not indicate how his omission of Pineda's presence, in the first portion of the plea agreement statement, can be reconciled. Instead, defendant argues that, because he expressed fear for his or his family's safety if he testified about Pineda, his omission should be excused. See United States v. Kelly, 337 F.3d 897, 902 (7th Cir. 2003) (the defendant's refusal to participate in a "ride-along" to identify codefendants was a substantial breach of his plea agreement where the defendant did not allege that the government's request was made in bad faith or that his participation would endanger him or his family). We disagree. We note that the omission of Pineda from the plea agreement statement included the omission of a fourth person--one, we note, who had been present in all other versions of defendant's description of events, even if the fourth person was not named. In earlier interviews, defendant was equally reluctant and fearful of the consequences should he speak about the fourth person, but he left the fourth person in the car even if he was not identified. We reject defendant's contention.

During oral argument, we raised the issue of the effect of the State's failure to call a breach of the plea agreement at the time of the plea agreement statement. Instead of declaring that defendant had breached the plea agreement immediately, the State attempted to schedule a polygraph examination. When neither Hiatt nor Weinert bothered to attend either of the scheduled polygraph examinations, which thus did not occur, the State moved to reinstate the first degree murder charges. While defendant did not argue this precise issue below or before this court, defendant did argue that

Judge Wilson allowed the State to reinstate the first degree murder charges due to his (and the State's) frustration with Hiatt and Weinert, and not due to defendant's breach of the plea agreement. Defendant never raised the issue of the timing of the State's declaration of breach and, consequently, has forfeited the issue. People v. Bennett, 376 Ill. App. 3d 554, 565 (2007). We note that, at the posttrial evidentiary hearing on whether defendant breached the plea agreement, the trial court (Judge Weir) expressly held that the variation between the initial portion of the plea agreement statement and the later portion, along with its disagreement with the physical evidence, constituted a breach. We have determined that this finding was not against the manifest weight of the evidence.

We do not address defendant's other contentions about the imprecision of the provisions of the plea agreement. We determined that, minimally, the plea agreement required that defendant convey truthful information without substantial omissions or falsehoods to law enforcement authorities. Defendant did not fulfill the minimal condition. Accordingly, we hold that defendant breached his plea agreement and that the State was properly allowed to reinstate the original charges.

### C. Ineffective Assistance of Trial Counsel

In his final point on appeal, defendant contends that he was provided ineffective assistance of counsel. While it would appear that we do not need to address this issue given our resolution of the suppression and plea agreement issues, defendant argues, in part, that his attorneys' incompetence cost him the plea agreement and requests for relief that his plea agreement be reinstated. Accordingly, we address this final issue on appeal.

First, defendant argues that counsel was ineffective for failing to facilitate successful completion of the plea agreement. Second, defendant argues that counsel was ineffective because

they did not seek to withdraw his guilty plea to the obstructing-justice count, which at trial the State used as evidence that he was accountable for the victim's murder.

Ineffective assistance is evaluated by the familiar two-step analysis of Strickland v. Washington, 466 U.S. 668, 80 L. Ed. 2d 674, 104 S. Ct. 2052 (1984). In order to prevail on the claim, a defendant alleging ineffective assistance must demonstrate that "(1) counsel's performance fell below an objective standard of reasonableness; and (2) there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different." People v. Berrier, 362 Ill. App. 3d 1153, 1166 (2006). Under the performance portion of the Strickland analysis, there is a strong presumption that the attorney's performance fell within the wide range of reasonable professional assistance; likewise, counsel's strategic decisions during the course of the proceeding generally fall under a strong presumption that the decisions were the product of sound trial strategy rather than attorney incompetence. Berrier, 362 Ill. App. 3d at 1166. We need not engage in both parts of the Strickland analysis in every case--if the defendant cannot demonstrate sufficient prejudice, then we may dispose of the ineffective assistance claim without also addressing the performance portion. People v. Glenn, 363 Ill. App. 3d 170, 173 (2006). In reviewing the trial court's determination as to an ineffective assistance claim, we defer to the trial court's factual findings, disturbing them only if they are against the manifest weight of the evidence; we review de novo the ultimate legal determination of whether counsel provided ineffective assistance. Berrier, 362 Ill. App. 3d at 1166-67. Where the facts are undisputed, however, we conduct a de novo review. Berrier, 362 Ill. App. 3d at 1167.

Defendant first contends that Hiatt and Weinert were ineffective because they did not facilitate his plea agreement. Defendant recites a litany of failure on the part of Hiatt and Weinert

and concludes that, but for these unprofessional errors, he likely would have successfully completed the plea agreement. While we agree with all of defendant's arguments in this regard about the unprofessionalism and neglect that Hiatt and Weinert accorded defendant's case and plea agreement, we nevertheless disagree with defendant's assessment of prejudice.

Defendant cannot sufficiently demonstrate the requisite prejudice because, even had Hiatt and Weinert facilitated the plea agreement, defendant, at the plea agreement interview, still would have given incomplete and inconsistent statements, especially regarding the presence of Pineda. Defendant claimed that he omitted Pineda's presence because he feared repercussions to himself and his family if he were to inculpate Pineda. Further, during the December 20, 2004, interview, defendant consistently represented to Jasnosz that he was afraid of Pineda and did not want to name him as a participant in the offense. In light of his repeated expressions of fear of Pineda, we do not believe that, had defendant's counsel apprised him of the necessity of telling the truth and maintaining consistency among his statements, he would have implicated Pineda. Thus, we cannot say that there was a reasonable probability that the outcome of the plea agreement interview would have been different. See Glenn, 363 Ill. App. 3d at 172 ("[a] reasonable probability is one sufficient to undermine confidence in the result of the proceeding"). Accordingly, defendant cannot demonstrate sufficient prejudice to support his claim of ineffective assistance of counsel premised on the failure to facilitate the plea agreement. See Glenn, 363 Ill. App. 3d at 173.

Defendant's remaining claim of ineffective assistance arises from counsel's failure to move to withdraw defendant's guilty plea to obstructing justice. Defendant contends that there was no objectively reasonable strategy for allowing the guilty plea to obstructing justice to stand and that it is preposterous to believe Hiatt's ad hoc justification that he acceded to defendant's instructions

to leave the obstructing-justice guilty plea undisturbed. Defendant contends that he was prejudiced because the State used the guilty plea and conviction of obstructing justice as evidence that defendant associated with a group determined to do violence to the victim and then cleaned his car in order to cover up evidence of that violence. Again, we conclude that defendant cannot demonstrate sufficient prejudice to maintain his ineffective assistance claim.

While the State did not need to introduce evidence pertaining to the obstructing-justice charge, it nevertheless did so. The State introduced a recording of a call that defendant made from the jail in which he admitted that he scrubbed blood out of his car. In the December 20, 2004, interview (which the State did not show to the jury, but which it could have), defendant also admitted that there was blood from Casas' shoes on the front passenger floor mat and that he scrubbed it clean. Notwithstanding the blood in defendant's car and his efforts to clean it up, the State introduced evidence that technicians had recovered blood from defendant's car. Thus, the State could have introduced overwhelming evidence to support defendant's guilt of obstructing justice. Because the State could have introduced sufficient evidence to support defendant's guilt, the State would have been able to make precisely the same argument--that defendant associated with a group determined to do violence to the victim and cleaned his car to hide evidence of that violence. Accordingly, defendant has failed to demonstrate sufficient prejudice to support his claim of ineffective assistance based on the failure to move to withdraw the plea of guilty to the obstructing-justice charge.

While we discern no prejudice accruing to defendant's first degree murder trial as a result of the guilty plea to obstructing justice, the guilty plea appears to have been motivated by the fact that the trial court erroneously held that defendant's statements to police were admissible at trial. We have held above that the statements to Jasnosz and Fletcher are inadmissible, thereby eliminating the

strategic basis for defendant's guilty plea. In light of the manifestly deficient representation provided by Hiatt and Weinert, we believe that the loss of the strategic basis for the guilty plea would unfairly propagate the deficient representation into the new trial on remand. Accordingly, we vacate the guilty plea to obstructing justice in order to return the parties to their initial positions.

### D. Double Jeopardy

Having determined that defendant's statements must be suppressed, we next must consider the double-jeopardy implications of such inadmissibility. Defendant did not seek outright reversal, but instead variously sought remandment for a new trial or reinstatement of his guilty plea to second degree murder. Another trial of this case raises double-jeopardy concerns, and we must independently consider the sufficiency of the evidence against defendant. Lopez, 229 Ill. 2d at 367.

The double-jeopardy clause prohibits a retrial for the purpose of allowing the State a second chance to supply evidence it failed to present in the first trial. Lopez, 229 Ill. 2d at 367. The double-jeopardy clause does not, however, prevent a retrial where the conviction is overturned because of an error in the first trial. Lopez, 229 Ill. 2d at 367. The double-jeopardy clause will prohibit a retrial if the evidence introduced at trial was insufficient to sustain a conviction; yet, in conducting the double-jeopardy analysis, we may decide the sufficiency of the evidence by considering all of the evidence, including the erroneously admitted evidence, submitted at the original trial, and if it is sufficient then the State may retry the defendant. Lopez, 229 Ill. 2d at 367. In considering the sufficiency of the evidence (including the statements made to Jasnosz and Fletcher), the relevant question is "whether, after viewing the evidence in the light most favorable to the State, any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." Lopez, 229 Ill. 2d at 367.

Here, defendant told Ocon that he drove the car to the site where the victim was killed. Defendant also told Ocon that it was his job to get close to the victim and gain his trust, so that the victim could receive a beating, but that the actions got out of hand and the victim was killed. (Defendant also confessed his involvement to Jasnosz and Fletcher, but this statement will be suppressed.) Defendant admitted cleaning the blood from his car. Based on defendant's statements to Ocon and the police, along with the physical evidence at the crime scene, we conclude that a rational trier of fact could have found defendant guilty beyond a reasonable doubt. Accordingly, there is no double-jeopardy bar to a retrial. Lopez, 229 Ill. 2d at 368.

### III. CONCLUSION

We have determined that the trial court erred in not suppressing defendant's statements to Jasnosz and Fletcher. We also have determined that defendant breached his plea agreement and did not demonstrate that he had been prejudiced by his attorneys' unprofessional representation. This leaves the question of defendant's relief to be determined. Because he was convicted on the basis of inadmissible statements, defendant's murder conviction must be vacated and the cause remanded with directions to suppress defendant's December 15, 2004, statements to Jasnosz and Fletcher in their entirety. We note that neither defendant nor the State has questioned the admissibility of the December 20, 2004, statement to Jasnosz. Because that statement is not before us, we express no opinion as to its admissibility, noting that it is an issue for the trial court to consider on retrial. Defendant also requested us to reinstate the plea agreement. Having found, however, that defendant breached the plea agreement, we cannot reinstate it. Additionally, we vacate the guilty plea to obstructing justice as, with the suppression of his statements, there is no strategic basis apparent for persisting in the plea. Thus, with the vacation of his convictions, defendant is returned to the

position of facing the three counts of first degree murder on which he was tried. Both he and the State are free to negotiate any plea agreements that either party believes to be in its interests. Accordingly, for the foregoing reasons, we vacate defendant's convictions and remand the cause for further proceedings consistent with this opinion.

Convictions vacated; cause remanded with directions.

McLAREN and JORGENSEN, JJ., concur.